**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 16-cv-0373-WJM-NYW

CELIA RANKIN, and
R. TODD RANKIN,

      Plaintiffs,

v.

USAA CASUALTY INSURANCE COMPANY,

      Defendant.

---

## ORDER ON PENDING CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

This insurance dispute raises a surprisingly contentious question:  If a homeowner's policy insures against a particular event (here, water leakage) and that event causes an aesthetic change in the home with no discernible effect on the home's value, is the aesthetic change nonetheless a "loss" entitling the homeowners to compensation?  Plaintiffs Celia and R. Todd Rankin (the "Rankins") argue that the answer is yes, while the issuer of their homeowner's policy, Defendant USAA Casualty Insurance Company, takes the opposite view.

The question has now been fully framed in the parties' competing cross-motions for partial summary judgment.  (ECF No. 54 (USAA's motion); ECF No. 55 (the Rankins' motion).)  For the reasons explained below, the Court agrees with USAA that the aesthetic change was not a "loss" under the relevant homeowner's policy.  The Court therefore grants USAA's motion and denies the Rankins' motion.  The Court also orders the parties to show cause why they should not be ordered to go to mediation to resolve

whatever remains of this dispute in the wake of this Order.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

The Rankins have owned a vacation home in Mountain Village, Colorado, near Telluride, since 1998.  (ECF No. 65 at 9, ¶ 1.)[1]  On February 25, 2014, the Rankins

---

[1] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in exhibits and in briefs with prefatory material (such as a table of contents).

learned of water leakage in the home.  (*Id*. at 10, ¶ 8.)  Apparently the water leakage

had been going on for some time prior to its discovery—the Rankins' water bills show

that it amounted to about 148,000 gallons.  (ECF No. 59 at 22, ¶ 2.)[2]  The Rankins

promptly reported the event  to USAA, the issuer of the homeowner's insurance policy

for the Rankins' Mountain Village home ("Policy").  (ECF No. 65 at 9–10, ¶¶ 3, 8.)

Among other things, the water leakage caused stains on the interior surface of

some of the logs forming the outer wall of the home.  (ECF No. 59 at 22, ¶ 3.)  The

Rankins also claim that the leakage caused new and increased "checking" (lengthwise

cracking) in the logs.  (*Id*. at 12, ¶ 8.)  USAA disputes this latter assertion, but is willing

to admit it for purposes of resolving the legal question presented in the parties' cross-

motions.  (ECF No. 54 at 8, ¶ 9 n.3.)  In any event, the parties do not dispute that

"[c]hecking is expected in large wood, including [in] the timbers used to construct [the

Rankins' home]."  (*Id*. ¶ 8.)  Moreover, checking had existed in the logs before the water

leak.  (ECF No. 59 at 25, ¶ 19.)  Todd Rankin claims that the leakage event caused

---

[2] The Rankins describe the event in more detail as follows:

> In February of 2014, a leaking toilet in a finished attic drowned the
> radiant heat system's boiler that heated the home.  So, the home
> lost heat for at least several days, resulting in multiple pipes
> freezing and breaking.
>
> The water and ice extensively damaged the "log portion" of the
> home, comprised of a "great room" (a kitchen and living/family
> room with a high vaulted ceiling), a master bedroom, and a master
> bathroom.  It also damaged the standard frame construction
> portion, consisting of a large garage, topped with two bedrooms, a
> bathroom, and a finished attic with a half bath . . . .

(ECF No. 55 at 7.)  The Rankins offer these details in an introductory narrative portion of their
summary judgment motion, so USAA never specifically received an opportunity to admit or deny
the various particulars.  *See* WJM Revised Practice Standard III.E.3–4.  Nonetheless, the exact
cause of the event is not material to the parties' cross-motions.

some pre-existing checks to increase in length by up to eighteen inches, and in width by up to one fourth of an inch. (ECF No. 54-5 at 5.)

In April 2014, Celia Rankin consulted with two contractors and "the impression [she] was left with after talking to [them]" was that the house might need to be entirely rebuilt because the contractors were "concerned about whether there was structural damage to the logs." (ECF No. 54-2 at 4–5.) But all parties agree now that the logs remain structurally sound. (ECF No. 59 at 11–12, ¶ 7.) Apparently this was agreed on fairly quickly because by June 2014 the Rankins' insurance claim, as it related to the log walls, became focused on the walls' "aesthetic condition," meaning the purely visual consequences of the staining and the checking. (ECF No. 54 at 8, ¶ 9; ECF No. 59 at 14.)[3]

Around this time, the Rankins began communicating with USAA through one of its adjusters, Sabra Johnson ("Johnson"). Johnson's claim notes for July 11, 2014 show that she reviewed the report of an engineer who had recently inspected the home, and that the report prompted her to approve coverage to some extent: "[E]ngineer notes areas w/water stains[;] confirms water can cause dmgs as shown. [N]otes indicate the cracking is throughout home . . . . [A]s engineer confirms water staining and that water can cause cracks, will allow coverage for areas that were in direct contact w/water[.]" (ECF No. 54-9 at 5.) Johnson's notes for that day also state that she called Celia

---

[3] The Rankins dispute the paragraph of USAA's statement of material facts in which USAA claims that the logs' "aesthetic condition" became the primary focus, but the only specific portion of that paragraph that the Rankins dispute is "the inference that they are searching for reasons to rebuild." (ECF No. 59 at 12–13, ¶ 9.) Thus, the Rankins have failed to dispute that the aesthetics of the logs, not their structural soundness, is solely at issue for purposes of the parties' cross-motions.

Rankin and left a message, the content of which Johnson summarized as "coverage for water dmgs, need her ctr [contractor] to provide estimate[.]" (*Id.*) According to Celia Rankin, Johnson specifically said on the telephone, "[Y]es, we'll replace the logs that have been damaged by the water." (ECF No. 59-7 at 18–19.) Moreover, in a July 22, 2014 e-mail to Joe Pace, an independent adjuster assisting USAA on the claim, Johnson announced, "We have agreed to remove and replace the logs in the areas that had direct water damage. Mrs. Rankin told me that her contractor discussed what work would be required in order to remove and replace the logs. We need to update the estimate to include these repairs . . . ." (ECF No. 59-20 at 1.) Finally, in a letter to the Rankins also dated July 22, 2014, Johnson wrote that she had "sent an email to Joe Pace requesting his assistance in updating the estimate. I have requested that he add [to the estimate] 'remov[al] and replacement of the logs in areas where they were damaged by water.'" (ECF No. 59-11 at 1 (internal quotation marks inserted for clarity).)

"Given the interlocking method of construction, the only way" to actually replace damaged logs in a home such as the Rankins' is "to take off the roof and remove every layer of logs above the lowest damaged log—essentially requiring a tear down." (ECF No. 59 at 12–13, ¶ 9.) It is not clear whether Johnson was aware of this at the time she informed the Rankins that the logs would be replaced.[4] USAA claims that a phone call

---

[4] The Rankins assert that Johnson understood this at the time of her July 2014 communications, but the only evidence the Rankins cite is Celia Rankin's deposition testimony, where she recounts that Johnson repeatedly told her in June and July 2014 that USAA was committed to restoring the home to "the condition it was [in] before the loss." (*Id.* at 23–24, ¶ 11.) This has nothing to do with Johnson's specific knowledge of the construction method necessary to replace the logs. The Court accordingly disregards the Rankins' assertion as unsupported. *See* Fed. R. Civ. P. 56(c)(1)(A); WJM Revised Practice Standard III.D.5. On the other hand, USAA claims that Johnson's July 24, 2014 claim log notes show that Johnson learned as of that date "that the walls in question are not loadbearing" and so they could be

took place on August 6, 2014, in which it became clear that removal and replacement involved, in essence, a complete re-build.  (ECF No. 61 at 10, ¶ 12.)

Not long after Johnson's communications with the Rankins in late July 2014, a new USAA adjuster named Mike Buettner ("Buettner") took over the claim from Johnson.  (ECF No. 59 at 24, ¶ 12.)  The Rankins claim that Buettner agreed to abide by all of Johnson's commitments.  (*Id.*)  Buettner, at his deposition in this case, did not recall ever making such a commitment.  (ECF No. 61 at 10, ¶ 12.)

From August through November 2014, Buettner and the Rankins went back and forth regarding an apparently new aspect of their claim relating to the home's in-floor radiant heating system, and when a test of that system would be conducted.  (*See generally id.* ¶¶ 13–15; ECF No. 61 at 10–11, ¶¶ 13–15.)  The particulars of whether this test was truly necessary, and if so, why it took so long to perform, are highly disputed, but not presently relevant.

In December 2014, Buettner approved an estimate for the Rankins' claim as a whole.  (ECF No. 54-7.)  Through that estimate, "USAA agreed to pay for sanding, staining, and refinishing the log walls, as well as removing and replacing the chinking of the log walls [*i.e.*, the mortar between the logs]."  (ECF No. 54 at 9, ¶ 13.)  These methods would address water staining, but not checking.  (ECF No. 54-8 at 3.)

USAA's December 2014 estimate totaled more than $114,000, inclusive of the

_____

removed and replaced "w/out having to do extensive rebuilding."  (ECF No. 61 at 9–10, ¶ 11 (internal quotation marks omitted).)  USAA points this out to support its contention that Johnson "did not believe removal of specific logs, if necessary, required rebuilding," as of July 24, two days after her letter to the Rankins.  However, USAA's cited exhibit ("Claim Log, Ex. I [ECF No. 54-9]") contains no entry dated July 24, 2014, and no entry otherwise resembling the quoted claim log material.  Thus, USAA's contention regarding Johnson's knowledge is likewise disregarded for lack of support.

steps to address water staining.  (ECF No. 54 at 9, ¶ 14.)  USAA in fact issued a series

of checks to the Rankins totaling the amount of the estimate.  (*Id.* ¶ 15.)[5]

By March 2015, the Rankins had retained an attorney to dispute USAA's

resolution of their claim.  (*See* ECF No. 54-10.)  Two months later, the Rankins hired a

Telluride contractor, Bill de Alva ("de Alva"), who evaluated the Rankins' expectations

for the home and then wrote to them as follows (in pertinent part) in a May 20, 2015

e-mail:

> I understand your expectation is that the completed
> restoration or reconstruction will have equal or better
> aesthetics, function and appraised value.  I also understand
> that the natural log finish may be a very important aspect of
> the aesthetics to you personally.  I believe it will be difficult if
> not impossible to restore that appearance with the existing
> water damaged logs.  That said, I also believe the existing
> logs and timber window and door bucks could be restored to
> an aesthetic condition that would also restore the asset
> value of the home.
>
> Assuming the ground floor slab can be replaced without
> demolition of the log structure, it is probable the cost to
> restore the existing log structure will be less than
> reconstruction.  Restoration of the existing logs and timber
> window and door bucks would likely involve some milling of
> surfaces that are out of plane, bleaching to remove water
> stains and application of a stain/finish.  New chinking and
> caulking would be necessary to restore the thermal
> performance of the structure.  A darker stain will be more
> effective in masking any trace water stains that remain after
> bleaching.  A darker stain also reduces the visibility of
> checking by reducing contrast. . . . .
>
> Convincing your insurance company that the log portion [of
> the] house must be rebuilt may largely hinge on their
> acceptance [that] there is no way to return the existing logs
> to similar condition and (unstained) appearance which

---

[5] It is not clear whether the Rankins have cashed these checks, but no party raises any issue turning on whether they have or not.

existed prior to the damage.  Nothing can be done to
eliminate the aggravated log checking that resulted from the
extreme moisture and temperature fluctuations.  I am happy
to emphasize above limitations to any restoration scenario in
my report.

* * *

I understand that you may believe there are additional
reasons the only acceptable solution is a demolition and
reconstruction of the entire structure.  It is possible I may
discover additional evidence in that regard during my
investigation.  I also understand if you believe my initial take
is too far astray from the path you believe is required for an
acceptable outcome. . . .

(ECF No. 54-4 at 2.)

It is now undisputed that de Alva's analysis is correct to the extent that milling

out-of-plane surfaces, bleaching the water-stained areas, and applying a new stain or

finish would result in "an aesthetic condition that would restore the asset value of the

home."[6]  With the possible exception of milling out-of-plane surfaces, de Alva's

recommendations were already included in the repair estimate USAA's Buettner

approved in December 2014, and for which USAA paid.  (ECF No. 54 at 9, ¶ 12.)[7]

_____

[6] USAA's Statement of Material Facts asserts, "There is no dispute, and even Plaintiffs'
own contractor expert [de Alva] agrees, that the log walls 'could be restored to an aesthetic
condition that would restore the asset value of the home.'"  (ECF No. 54 at 8, ¶ 10.)  USAA also
asserts, "The repair method to restore the asset value of the house would likely consist of [the
measures described by de Alva]."  (*Id.* at 9, ¶ 11.)  Regarding the first assertion, the Rankins
respond, "Disputed . . . misstates USAA's contractual duty" (ECF No. 59 at 15, ¶ 10); and as to
the second assertion, the Rankins respond in a manner the undersigned has never before seen
in this context: "Neutral" (*id.* at 15–16, ¶ 11).  These are not proper denials—they are
transparent attempts to avoid admitting facts that the Rankins view as unfavorable.  The Court
disregards the Rankins' responses and deems USAA's assertions admitted.  *See* Fed. R. Civ.
P. 56(c)(1)(A); WJM Revised Practice Standard III.D.4.  It is also worth noting that the Rankins
themselves list de Alva as a "may call" witness (potentially as an expert) in the Final Pretrial
Order.  (ECF No. 65 at 24.)

[7] The Rankins note that USAA's repair estimate did not include milling.  (ECF No. 59 at
16, ¶ 12.)  USAA responds that milling and sanding are both "construction methods used to

The Rankins have never tried to repair the water staining, using de Alva's proposed methods or otherwise, "since only replacing the logs will fix the checking." (ECF No. 59 at 18, ¶ 17.) "[The Rankins'] objection to the repair method identified by Mr. de Alva and proposed by USAA is that, after repair, the log walls would look aesthetically different, in [their] subjective opinion, then they had prior to the loss." (ECF No. 54 at 10, ¶ 18.)[8] As USAA describes it, "[b]ecause checking is a natural phenomenon and cannot be reversed or repaired, [the Rankins] insist that USAA . . . must pay to tear down and rebuild the house with logs that have smaller checks." (ECF No. 58 at 8.) USAA says this would likely cost $1.3 million (ECF No. 54 at 15), although it is not clear which party developed this estimate.

At an impasse, the Rankins filed this lawsuit in San Miguel County District Court in January 2016, asserting claims for breach of contract, common law bad faith, and statutory unreasonable delay or denial (Colo. Rev. Stat. §§ 10-3-1115 & -1116). (ECF No. 6.) The following month, USAA removed to this court because the parties are diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a).

### III. ANALYSIS

### A.    Framing the Dispute

Viewing the facts in the light most favorable to the Rankins, their frustration is

reduce surfaces using abrasion. Mr. de Alva's proposal used milling but not sanding, while USAA . . . paid for sanding but not milling. Plaintiffs offer no evidence that these alternate methods to reduce surfaces on the log walls are not materially the same." (ECF No. 61 at 6–7, ¶ 12.) But USAA similarly fails to support its assertion that milling and sanding were materially equivalent under the circumstances. In any event, this minor factual skirmish has no relevance to the overall question presented in the parties' cross-motions.

[8] The Rankins object to this assertion because their aesthetic judgment is supposedly irrelevant to USAA's contractual duties. (ECF No. 59 at 18–19, ¶ 18.) This non-answer is deemed an admission.

understandable.  Knowing that the Rankins' claim involved both the water staining and increased checking, USAA (through Johnson) apparently made a coverage decision encompassing replacement of the logs.  Then USAA learned that replacing the logs would mean rebuilding most of the home, further learned that such a rebuild would likely be very expensive, and (through Buettner) backed off Johnson's coverage decision.  A jury could easily accept this story.

However, the Rankins disavow any theory of contractual breach based on USAA's apparent choice to renege on Johnson's alleged promises.  More specifically, USAA's summary judgment motion attacks "any theory predicated on purported promises by USAA during the claims process," including any sort of oral contract amendment or promissory estoppel (ECF No. 54 at 25–26 (formatting normalized)); and the Rankins respond that they assert no such theories (ECF No. 59 at 40–47).  Rather, the Rankins say, Johnson's promises simply reflected what the Policy already required. (*See, e.g.*, *id.* at 44 ("the promises were entirely consistent with the policy purchased by the Rankins from USAA").)  Thus, the parties' cross-motions reduce to a dispute solely regarding the proper construction of the Policy.  Colorado law governs this analysis.[9]

In Colorado,

[a]n insurance policy is merely a contract that courts should

---

[9] The parties have not pointed the Court to any choice-of-law clause in the Policy, but both parties argue primarily from Colorado law.  Federal courts sitting in diversity apply the forum state's choice of law principles.  *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1143 (10th Cir. 2009).  Colorado choice-of-law rules provide that an insurance contract is governed "by the law of the state with the most significant relationship to the insurance contract."  *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009).  The Rankins are Colorado residents and the Policy insures property in Colorado.  Consequently, Colorado has the most significant relationship to the Policy, and Colorado law therefore controls.  *See Berry & Murphy*, 586 F.3d at 808.

> interpret in line with well-settled principles of contract interpretation. In undertaking the interpretation of an insurance contract, courts should be wary of rewriting provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy. Courts should read the provisions of the policy as a whole, rather than reading them in isolation. Courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage. However, because of the unique nature of insurance contracts and the relationship between the insurer and insured, courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured.

*Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) (citations omitted). "In order for a policy provision to be ambiguous, it must be reasonably susceptible to different interpretations." *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 939 (Colo. 1999). Whether an ambiguity exists, and the proper construction of the insurance agreement generally, are both questions of law. *Cyprus*, 74 P.3d at 299; *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996).

## B. "Direct, Physical Loss"

The parties agree that the portion of the Policy establishing the coverage relevant to the Rankins' claim reads as follows: "We insure against '**sudden and accidental**' direct, physical loss to tangible property . . . ." (ECF No. 55-1 at 39 (boldface in original).) No party raises any issue regarding the phrase "sudden and accidental." Rather, the parties dispute the meaning of "direct, physical loss."

USAA argues that "direct," "physical," and "loss" must be interpreted separately. USAA has no dispute that the increase in checking, if in fact caused by the water leakage event, was "direct" and "physical" within the Policy's meaning. (ECF No. 61 at 14.) USAA only disputes that it would be a "loss." USAA defines "loss" as "financial

11

detriment." (ECF No. 54 at 16.) USAA draws this definition from *Black's Law Dictionary*: "The amount of financial detriment caused by . . . an insured property's damage, for which the insurer becomes liable." *Black's Law Dictionary*, *s.v.* "loss" (definition 3) (10th ed. 2014).

According to USAA, this does *not* raise a question of whether the Policy covers aesthetic losses (as the Rankins sometimes frame the dispute). Rather, USAA contends that it

> has consistently agreed to coverage only for claimed damage that resulted in a financial detriment to Plaintiffs, regardless of whether the claimed damage was merely aesthetic. There is no dispute that the water staining constituted aesthetic damage that was a "direct, physical loss," because it had an impact on value even though it had no impact on function. Further, there is no genuine dispute that the full function and economic value of the log walls can be restored by addressing only the water stains and thermal performance of the chinking, without the need to address the purportedly increased checking. Pursuant to the plain language of the Policy, USAA . . . therefore paid Plaintiffs for the damage that resulted in a financial detriment (including aesthetic damage from water staining), while denying coverage for claimed aesthetic damage that undisputedly resulted in no financial detriment to Plaintiffs (the supposedly increased checking).

(ECF No. 61 at 16 (emphasis removed; citation omitted).)[10]

The Rankins argue, by contrast, that "direct, physical loss" (and "physical loss" in particular) is generally construed as a compound phrase that has nothing necessarily to

---

[10] Apparently throughout this lawsuit there has been some dispute whether applying a new type of stain to the logs (as part of remediating the water stains) is an appropriate form of coverage. USAA's summary judgment motion addresses both the staining question and the checking question, but the Rankins' motion and reply, and their response to USAA's motion, all focus on the checking, with no argument specific to the staining proposal. The Court presumes that remediation-by-staining has therefore been abandoned as a live issue in this case.

do with financial detriment.  (*See* ECF No. 60 at 14–21.)  The Rankins' argument is largely based on case law, including some case law that consults less insurance-specific dictionary definitions.  (*Id.* at 15.)  The Rankins also argue from secondary authorities, and from a Policy exclusion regarding diminution in value.  The Court will address all of these potential authorities in turn, beginning with dictionary definitions, then moving to case law and secondary authorities, and finally addressing the Policy's treatment of diminution in value.

  1. <u>Dictionary Definitions of "Loss"</u>

  To repeat, USAA relies on the *Black's Law Dictionary* definition of "loss": "The amount of financial detriment caused by . . . an insured property's damage . . . ."  This definition—the third definition for "loss" listed in *Black's*—is preceded by the label "*Insurance*." (italics in original), thus signaling its context-specific nature.

  The Rankins do not offer a directly competing definition.  As noted, they instead offer cases in which courts have considered broader dictionary definitions.  In particular, the Rankins (*see* ECF No. 60 at 15) cite *Corban v. USAA*, 20 So. 3d 601 (Miss. 2009), in which the Mississippi Supreme Court consulted a dictionary (cited as "Webster's II New College Dictionary") for the following definitions of "loss": "1. An act or instance of losing. 2. One that is lost. 3. Injury or suffering caused by losing or by being lost."  *Id.* at 613 (internal quotation marks omitted).  As will become clear below, *Corban* was actually exploring *when* a loss occurs, not what "loss" means.

  In any event, Colorado courts view "*Black's Law Dictionary* as a source of 'the most widely accepted legal meaning' of undefined terms."  *Hickman v. Catholic Health Initiatives*, 328 P.3d 266, 269 n.3 (Colo. App. 2013) (quoting *People v. Holwuttle*, 155

P.3d 447, 450 (Colo. App. 2006)).  And Colorado courts have frequently consulted *Black's* when construing insurance policies.  *See, e.g.*, *Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1228 (Colo. 2016); *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 820 (Colo. 2002); *Republic Ins. Co. v. Jernigan*, 753 P.2d 229, 232 (Colo. 1988); *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1029–31 (Colo. App. 2002).  Furthermore, Merriam-Webster's insurance-specific definition of "loss" closely tracks the *Black's* definition: "the amount of an insured's financial detriment by death or damage that the insurer is liable for." Merriam-Webster Online, *s.v.* "loss" (definition 6), *at* https://www.merriam-webster.com/dictionary/loss (last accessed Aug. 21, 2017).  The Rankins have offered no argument why a nonspecific definition should control over the insurance-specific definitions from *Black's* and Merriam-Webster.

### 2. Cases Interpreting Similar Policy Provisions

The bulk of the Rankins' argument comes from cases and secondary authorities. Most of these sources are answering questions such as when a loss occurs, or what constitutes a "physical" loss, and nearly all of them turn out to indirectly support USAA's definition.

#### a. *Widdows (Fla. Dist. Ct. App. 2006)*

The Rankins describe *Widdows v. State Farm Florida Insurance Company*, 920 So. 2d 149 (Fla. Dist. Ct. App. 2006), as holding that an "abnormality in a pipe is a physical loss even if the abnormality causes no damage."  (ECF No. 60 at 16.)  This description is mostly accurate—"*has yet to cause* damage" would be more precise—but *Widdows* also has nothing to say about whether "loss" requires a "financial detriment" or not.

*Widdows*—a six-paragraph decision—arose from a backed-up toilet caused by "sewer pipe [that] had become 'backpitched,' thereby impeding the flow of water."  920 So. 2d at 150.  Apparently the insurance company refused to repair the pipe, but the opinion does not describe the insurance company's justifications.  In the ensuing lawsuit, "the trial judge granted an involuntary dismissal . . . because there was no evidence of damage from the obstructed toilet, the court concluded that there was not a 'physical loss' to the property."  *Id.*  The appellate court rejected this reasoning: "As to the issue of whether evidence was adduced of a 'physical loss,' we conclude that the abnormality in the pipe itself was such a 'loss.'  Under the language of the policy, it was not necessary for Appellant to establish any resulting damage from this condition."  *Id.*

As the quoted portions make clear, *Widdows* centered on whether a physical abnormality must cause damage *to something else* before it is deemed a "physical loss."  The Florida appellate court held in the negative, without discussing whether "loss" required a financial detriment or otherwise—likely because, under the facts of the case, the financial detriment was obvious.  A home's value will certainly be reduced by a toilet that inevitably backs up due to a plumbing defect.  *Widdows* also fits within a category of cases finding "physical" loss or damage under the "the theory that the *threatened* physical damage to the insured building from a covered peril essentially triggers the insured's obligation to mitigate the impending loss by undertaking some hardship and expense to safeguard the insured premises."  10A Steven Plitt *et al.*, *Couch on Insurance* § 148:46, text accompanying n.8 (3d ed., June 2017 update) (emphasis added).  *Widdows* does not inform the question of whether "loss" requires economic detriment, particularly under the Policy at issue here.

15

b.    *Corban (Miss. 2009)*

*Corban*, already mentioned above, involved a home near Mississippi's Gulf Coast.  20 So. 3d at 605–07.  Hurricane Katrina caused significant damage to the home, both through high winds and storm-surge flooding.  *Id.*  The applicable policy excluded water damage caused by flooding, and the Mississippi Supreme Court held that storm-surge flooding was not some sort of different kind of flooding that fell outside the exclusion.  *Id.* at 610-11.  In that light, however, the major question presented was the effect of the policy's "anti-concurrent clause," which excluded losses caused concurrently by a covered peril (such as wind) and an excluded peril (such as flooding).  Before construing "concurrently" under the policy, the court explored the question of when a loss "vests" as a loss, or in other words, at what point does an event become a "loss" that the insurance company must cover, regardless of whether the loss might later be exacerbated by an excluded peril?  *Id.* at 611–13.

This inquiry led the court into a discussion of the definition of "loss."  The court "first observe[d] that the parties and trial court in this proceeding, as well as other courts in cases cited, have conflated the terms 'loss' and 'damage.'  A 'loss' is incurred by an insured and typically, but not always, follows 'damage' to his or her property."  *Id.* at 612.  The court then inserted a footnote giving "example[s] of loss[es] in the absence of direct physical damage," namely, the policy's protections against credit card fraud and theft.  *Id.* at 612 n.17.

The court went on to note that the policy did not define "loss," and it therefore turned to various dictionaries:

> Elsewhere, "loss" has been defined as "1. An act or instance
> of losing. 2. One that is lost. 3. Injury or suffering caused by

> losing or by being lost." Webster's II New College Dictionary 647 (3d ed. 2001). *See also* Bryan A. Garner, *A Dictionary of Modern Legal Usage*, 538 (2d ed. 1995) (to "lose" is "to suffer the deprivation of; to part with."); *Black's Law Dictionary* 54 (4th ed. 1968) ("actual loss" is defined as "[o]ne resulting from the real and substantial destruction of the property insured.").

*Id.* at 613. From these sources, the court concluded "that loss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured." *Id.*

As is plain from this holding, the question on the Mississippi Supreme Court's mind was *when* a loss occurs. The court could not have been considering whether "economic detriment" needed to be a part of the loss—if it had, the various quoted dictionary definitions would be in tension. "To suffer the deprivation of" and "real and substantial destruction" can be quite different when viewed from an economic perspective.

Moreover, the economic detriment to the homeowners was obvious under the facts of the case. And the Mississippi Supreme Court's examples of "losses" not preceded by "damage"—theft and credit card fraud—display the court's implicit assumption that "loss" involves economic detriment. Thus, *Corban* provides no help to the Rankins' case.

c.    *In re Chinese Manufactured Drywall (E.D. La. 2010)*

The Rankins cite *In re Chinese Manufactured Drywall Product Liability Litigation*, 759 F. Supp. 2d 822 (E.D. La. 2010), for the proposition that "[c]ourts construing USAA's 'direct, physical loss' in other jurisdictions have found that all damage resulting from a covered *direct, physical loss* require indemnification by the insurer in similar

policies." (ECF No. 60 at 16 (emphasis added)).)  But *Chinese Manufactured Drywall* was about drywall that emitted foul-smelling and corrosive vapors that damaged metal and electronic equipment.  759 F. Supp. 2d at 827.  The question presented was whether loss-by-vapor was "physical," *see id.* at 831–32, not whether "loss" requires economic detriment (such detriment, again, being obvious on the facts of the case).

        d.     *Mangerchine (La. App. 2011)*

The Rankins cite *Mangerchine v. Reaves*, 63 So. 3d 1049 (La. App. 2011), because it supposedly contains a broader definition of loss than the definition USAA proposes.  (ECF No. 60 at 20–21.)  *Mangerchine* involved a home with alleged "redhibitory defects" (a civil law concept similar to the common law concept of latent defects).  63 So. 3d at 1051–52.  As in *Corban*, the issues in *Mangerchine* required determining when a covered "loss" occurred, and thus exploring what "loss" means:

> "Loss" and "direct physical loss" are not defined in the policy; accordingly, those terms must be given their ordinary, generally-accepted meanings.  [Citation omitted.]  In general, a "loss" means a "destruction," "ruin," or "deprivation." *Merriam-Webster's Collegiate Dictionary* 736 (11th ed. 2008).  Another definition of "loss," in the specific context of insurance, is "the amount of an insured's financial detriment by . . . damage that the insurer is liable for." *Id.*  [Footnote quoting *Black's* "economic detriment" definition omitted.]  The determination of when "damage" to property occurs, strictly speaking, involves only an objective analysis of the time at which actual physical change or injury to the property takes place.  The term "loss," on the other hand, combines the element of physical damage to the property with that of corresponding reduction in patrimony from the subjective standpoint of the insured.
>
> The terms "loss" and "damage," as used in insurance policies, are not necessarily synonymous.  *See* [*Corban*].  A "loss" under the property coverage of a homeowners' policy is incurred by an insured and typically, but not always, follows "damage" to the insured property.  *Id.*  Physical

18

> damage is only one cause of "physical loss" of property; for
> example, a person can suffer the physical loss of property
> through theft, without any actual physical damage to the
> property.

*Id.* at 1056.  In light of these principles, the Louisiana court then went on to analyze

when a loss "occurs."  *Id.* at 1057.

The Rankins rely on portions of the two above-quoted paragraphs, but when

analyzed in full, they actually undermine the Rankins' argument.  The last sentence of

the first paragraph—which the Rankins omit by ellipses from their quotation (*see* ECF

No. 60 at 21)—turns out to be crucial: "The term 'loss' [as distinct from 'damage']

combines the element of physical damage to the property with that of corresponding

*reduction in patrimony* from the subjective standpoint of the insured."

"Patrimony" is a civil law term referring to "the total mass of existing or potential

rights and liabilities attached to a person for the satisfaction of his economic needs. . . .

[¶] In theory, the patrimony of a debtor is the totality of his assets and liabilities which

are susceptible of pecuniary evaluation."  *Creech v. Capitol Mack, Inc.*, 287 So. 2d 497,

504 (La. 1973); *see also Black's Law Dictionary*, *s.v.* "patrimony" (definition 2) (10th ed.

2014) ("*Civil law*.  All of a person's assets and liabilities that are capable of monetary

valuation and subject to execution for a creditor's benefit.").  *Mangerchine*, in other

words, agrees with USAA that "loss" require some sort of detriment capable of

economic valuation.[11]

---

[11] This Court could find no explanation of "patrimony" specifically "from the subjective standpoint of the insured."  Patrimony, as defined by the Louisiana Supreme Court in *Creech*, appears to refer to objective notions of economic value.  Given the context of *Mangerchine*, which centered around latent defects and the question of whether their discovery after purchase of the home qualifies as an insurable "loss," the Court presumes that "from the subjective standpoint of the insured" refers to the insured's discovery of the defect and subsequent

e.    *Advance Cable (W.D. Wis. 2014 & 7th Cir. 2015)*

The Rankins also rely on *Advance Cable Co., LLC v. Cincinnati Insurance Co.*, 788 F.3d 743 (7th Cir. 2015).  (*See* ECF No. 60 at 18.)  *Advance Cable* is best understood by first reviewing the underlying district court decision, 2014 WL 975580 (W.D. Wis. Mar. 12, 2014).

The *Advance Cable* lawsuit arose from a hailstorm that allegedly caused dents in a metal roof.  *Id.* at *2.  None of the dents were visible from ground level, and all parties agreed that there was no evidence the roof had been compromised, or that its useful life had been shortened.  *Id.* at *2–3.  The insurer refused to pay to replace the roof.  *Id.*

The policy in question, like the Policy here, insured against "direct physical loss." *Id.* at *1.  But unlike the Policy here, the policy in *Advance Cable* contained a definition of "loss": "'accidental loss or damage.'"  *Id.* at *7.  "The question, then, [was] whether 'purely cosmetic' denting in the metal roof constitute[d] direct, physical and accidental loss or damage as a reasonable insured would understand those terms."  *Id.*  The plaintiff argued that "even purely cosmetic denting constitutes 'loss or damage' because it has altered the roof's appearance."  *Id.* at *9.  The insurance company countered "that the denting in this case is not 'loss or damage' because it: (1) is not visible from ground level; and (2) did not affect the structural integrity or life of the roof."  *Id.*

The district court resolved this impasse by noting the distinction between "loss or damage": "Even presuming that there has been no quantifiable 'loss,' the policy expressly contemplates the possibility that there may still be 'damage,' presumably

_____

formation of a belief that the defect reduces his or her economic worth—thus prompting the insured to report the "loss."

20

giving it a different meaning than the word 'loss.'" *Id.* at *10.  The court then drew from

*Couch on Insurance* the following definition of "damage": "'when an item of tangible

property has been physically altered by perils like fire, or water.'"  *Id.* at *10 (quoting 10A

*Couch on Insurance* § 148:46 (3d ed. 2013)).  Under the circumstances, the court said,

> there can be no meaningful dispute that a physical alteration
> to the property occurred.  Even assuming this alteration is
> merely cosmetic, as [the insurance company] contends,
> there are still dents in the roof panels ranging from barely
> discernible to an inch or so in diameter.  That the denting is
> minor does not alter the fact that it is still a tangible alteration
> to the roof.  The Policy does not state that damage must
> reach some level of severity to trigger the coverage
> threshold.  For that matter, the Policy neither provides that
> damage must be visible from a particular, unspecified
> vantage point to trigger coverage, nor that damage must
> shorten the life or undermine the structural integrity of the
> Property to trigger coverage.

*Id.*  Thus, the court found that coverage was required.

The Seventh Circuit affirmed this reasoning:

> The policy covers loss *or* damage.  This indicated to the
> district court that even without a measurable "loss" in value
> or in function, "the policy expressly contemplates the
> possibility that there may still be 'damage,' presumably
> giving it a different meaning than the word 'loss.'"  This was
> a sensible conclusion, and [the insurance company] has
> given us no reason to believe that inclusion of the phrase "or
> damage" in the definition of loss was superfluous.  In fact, it
> has offered no explanation for the inclusion of both words,
> despite, we assume, having written the policy.
>
> . . . There is no exception to the definition of "loss" for
> cosmetic damage, or any other kind of particular damage.
> Had [the insurance company] wished to exclude cosmetic
> damage from coverage, it should have written the policy that
> way.

788 F.3d at 747 (emphasis in original).

The obvious difference between *Advanced Cable* and this case is the "or

damage" clause on which the outcome turned, and which does not exist in the Policy currently under consideration. Moreover, *Advance Cable* implicitly supports USAA's position. The insurance company argued that "loss or damage" should not apply unless the roof's lifespan had been shortened (an economic detriment), or at least that the denting be noticeable from below (also an economic detriment, given the likely reaction of anyone interested in purchasing the building). The district court and Seventh Circuit avoided these constructions by holding that "damage" meant something broader—thus implying that the insurance company's proposed limitations fell on the "loss" side of "loss or damage." Indeed, the district court referred to "loss" in terms of "quantifiable 'loss,'" 2014 WL 975580, at *10; and the Seventh Circuit approvingly summarized this portion of the district court's decision with the words "measurable 'loss,'" 788 F.3d at 747. In other words, the district court and Seventh Circuit appeared to have accepted the notion that "loss," by itself, requires objectively discernible economic harm.

   f. *Great Plains Ventures (D. Kan. 2016)*

   The Rankins also cite *Great Plains Ventures, Inc. v. Liberty Mutual Fire Insurance Co.*, 161 F. Supp. 3d 970 (D. Kan. 2016). (ECF No. 60 at 20.) *Great Plains* presents materially the same fact pattern as *Advance Cable*, namely, "hail indentations [in a number of metal roofs that] did not affect the functionality or service life of the roofs," and a policy that insured against "direct physical loss or damage." 161 F. Supp. 3d at 974, 975. Relying heavily on *Advance Cable*, the district court concluded that "damage" could encompass dents caused by hail regardless of their economic impact. *Id.* at 977–78. *Great Plains*, consequently, affords no more help to the Rankins than *Advance Cable*.

g. *Couch on Insurance*

The Rankins also draw from *Couch on Insurance*, specifically, its discussion of "'physical' loss or damage" (the same discussion relied upon by the district court in *Advance Cable*). (ECF No. 60 at 15.) The Rankins quote *Couch* as follows: "A *physical loss* requires a 'distinct, demonstrable, physical alteration of the property.'" (*Id.* (quoting 10A *Couch on Insurance* § 148:46) (emphasis in original)). The Rankins believe this is broad enough to cover the checking at issue here. However, the Rankins omit the entirety of the sentence they quote, perhaps because it undermines rather than supports their interpretation:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

10A *Couch on Insurance* § 148:46, text accompanying nn.4–6 (3d ed., June 2017 update).

Obviously this statement focuses on how the word "physical" might modify "loss," not what "loss" itself means. More importantly, the analysis uses the phrase "a detrimental economic impact" as a synonym for "loss."[12] Again, the Rankins' citation supports USAA's definition.

---

[12] At one point, the Rankins' summary judgment response brief displays essentially the same analysis, arguing that a "physical loss" is "a perceptible loss, it is material, tangible, solid, and concrete, *not just economic*." (ECF No. 59 at 30 (emphasis added).) The Court presumes the Rankins meant "not *necessarily* economic."

h.　　*The FC & S Bulletin*

Finally, the Rankins draw on the "*FC & S Bulletin*," which they describe as

follows:

> The National Underwriter Company publishes under the
> name FC & S, or Fire, Casualty & Surety, a comprehensive
> library of reference books for insurance professionals.  FC &
> S also provides online bulletins in which its experts respond
> to questions from insurance professionals.  The bulletin is
> used by insurance agents and brokers to interpret standard
> insurance policy provisions.

(ECF No. 60 at 18–19.)  A few years ago, this online bulletin service published the

following question and answer, as quoted by the Rankins:

> [Question:] Hail stones have created dents to a copper roof.
> The section of roofing is located over a second story bay
> window.  It does not appear that the hail has compromised
> the life span of the roof's surface or otherwise affected or
> decreased its useful lifespan.  Our HO policy provides
> coverage for direct physical loss.  If the roof's integrity was
> not compromised by the hail stone impact, has a physical
> loss occurred?  We believe that some carriers view this type
> of damage as cosmetic and do not provide coverage for
> replacement of copper roof.  Does FC & S have an opinion?
>
> [Answer:] Whether or not the dents are cosmetic or affect the
> roof structure, they are still direct physical loss.  The policy
> doesn't define damage so standard practice is to go to a
> desk reference.  Merriam Webster online defines damage as
> loss or harm resulting from injury to property, person, or
> reputation.  The roof now has dents where it didn't before;
> that's direct damage.  The policy doesn't exclude cosmetic
> damage, so direct damage, even if it is cosmetic, is covered.
> It's the same as if vandals had painted the side of the house
> purple.  While cosmetic, it's damage, and is covered.  The
> principle of indemnity is to restore the insured to what they
> had before the loss, and this insured had a roof with no
> dents.

(*Id.* at 19 (quoting "'Direct Physical Loss and Cosmetic Loss,' *FC & S Bulletin*, (Nat'l

Underwriter Co. December 5, 2011)")).

24

The Court cannot credit this source with even persuasive authority. Its most significant problem is that both the question and the answer continually elide the distinction between "loss" and "damage." The most jarring example comes in the first two sentences of the answer: "Whether or not the dents are cosmetic or affect the roof structure, they are still direct physical *loss.* The policy doesn't define *damage* so standard practice is to go to a desk reference" (emphasis added). The author either does not recognize that he or she has subconsciously jumped from "loss" to "damage," or the author already views those words as synonymous. If the former, the author's analysis is inexcusably sloppy. If the latter, the author's view contradicts most of the cases analyzed above—cases offered by the Rankins—in which courts frequently emphasized a meaningful distinction between "loss" and "damage."

Another problem is that the question and answer do not provide the reader with the exact policy language to be construed—even though the author must have had some specific policy in mind (otherwise, "[t]he policy doesn't define damage" would be nonsensical). If the policy in question referred to "loss or damage" (a reasonable assumption, given the constant switching back and forth between the two terms), then FC & S's opinion is irrelevant to the present circumstances.

In short, the Court can derive nothing of assistance from the *FC & S Bulletin*.

3.    "Diminution in Value"

Returning to the language of the Policy itself, the Rankins argue that "loss" cannot refer to economic detriment—at least not in the sense of "restor[ing] the asset value of the home," as de Alva put it—because the Policy contains a diminution-in-value exclusion. (ECF No. 59 at 15; ECF No. 60 at 15 n.2.) Specifically, the policy states that

USAA "do[es] not insure for damage consisting of or caused directly or indirectly by any of the following[:] * * * **Diminution in value**, meaning any reduction in value that would remain after damaged property is repaired or replaced." (ECF No. 55-1 at 42, 43 (boldface in original).) "So," the Rankins say, "restoration of the asset value is not the measure of the loss here." (ECF No. 59 at 15.) They continue, "the policy only addresses diminution in value after repairing or replacing the physically damaged property." (ECF No. 60 at 15 n.2.)

The Rankins' argument answers itself, particularly in the phrase "after repairing or replacing." This exclusion assumes that USAA has already covered some sort of "direct, physical loss." These sorts of exclusions generally seek to foreclose the argument that the very fact of damage and repair creates a stigma on the property and a corresponding drop in market value that the insurer should cover. *Cf. Given v. Commerce Ins. Co.*, 796 N.E.2d 1275, 1276 (Mass. 2003) (discussing the "stigma" theory in the auto insurance context). If anything, by addressing stigmatic economic detriment, a diminution-in-value exclusion indirectly supports the notion that economic detriment is, indeed, the focus of the insurance policy. In any event, this Policy's diminution-in-value exclusion does not inform the question of what a "loss" is in the first place.

4.    Ambiguity

With the arguable exception of the *FC & S Bulletin*, none of the Rankins' authorities supports the notion that a policy which insures against "loss" (as opposed to "loss or damage") covers aesthetic losses with no detrimental economic impact. The Rankins argue in the alternative, however, that the Policy is at least ambiguous on this

point, and that they propose a reasonable definition—in which circumstance, Colorado law requires the Court to construe the policy in favor of the Rankins.  (*See* ECF No. 59 at 39–40.)  As set forth above, the existence of ambiguity is a question of law, and requires language susceptible of two reasonable constructions.  *Cyprus*, 74 P.3d at 299; *Wallis*, 986 P.2d at 939.

Having worked through the Rankins' various authorities, it is clear—and surprising—that the Rankins do not directly propose any construction of "loss."  Their argument, rather, appears to be that other courts interpreting other policies have found coverage for aesthetic losses with no discernible economic effect, and so this Court may as well.  Such an argument is untethered from the Policy at issue here.  Thus, the Rankins' ambiguity argument fails simply because the Rankins fail to propound a construction of "loss" as that term is used in the Policy.  The Court cannot evaluate the reasonableness of a competing construction without actually being given a construction.

Even if the court were to synthesize a construction of "loss" from the Rankins' various arguments, it could only be something to the effect of "a change to the property that the insured finds displeasing, regardless of whether a non-insured would notice or care about the change."  The Rankins present no argument regarding how such a construction could be reasonable, other than simply declaring that they "have provided a plausible and fair reading."  (ECF No. 59 at 40.)  But the *only* authority that comes close to supporting their construction is the highly problematic *FC & S Bulletin*.  The remainder of their authorities tend to support USAA's construction.  The Rankins have therefore failed to demonstrate that their reading is reasonable.  And, absent reasonable competing constructions, the Court cannot conclude that the Policy is

ambiguous.

5.    <u>Synthesis</u>

For all the foregoing reasons, USAA is entitled to judgment as a matter of law that "loss," as used in the Policy, means "financial detriment." Because it is undisputed that the alleged new and increased checking caused no financial detriment to the Rankins, USAA is likewise entitled to judgment as a matter of law on any theory of liability under the Rankins' three causes of action that assumes USAA had a duty to provide coverage for new and/or increased checking allegedly caused by the water leakage discovered in February 2014.

**C.**    **The Potential for Mediating the Remainder of the Case**

The parties' filings allude to additional lingering disputes, such as whether the in-floor radiant heating system needs repairs or replacement. However, from the discussion at the April 2017 status conference (*see* ECF No. 70), the Court understands that the issue resolved in this Order is the weightiest issue in the case. The Court accordingly presumes that whatever remains is of substantially less economic importance.

Moreover, the Court repeats its view, expressed at the status conference, that no party is more likely than the other to secure a jury's sympathy. The Rankins will surely attempt to portray USAA as the "big, bad insurance company"—a potentially successful approach. On the other hand, a jury would not fail to recognize that the Rankins themselves are wealthy, and USAA is sure to point out that the Rankins have since divorced and "have no evidence that they intend to live in or use the house in the future, as this is the last remaining asset they still own jointly." (ECF No. 54 at 10, ¶¶ 20–21.)

The remainder of this dispute therefore seems well-positioned for private mediation. The Court will order the parties to show cause why the Court should not order the parties to go to mediation sufficiently in advance of the trial currently scheduled for November 2017.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  USAA's Motion for Partial Summary Judgment (ECF No. 54) is GRANTED and the Court FINDS as a matter of law that

    a.  "loss" as used in the Policy means "financial detriment";

    b.  the increased log checking allegedly caused by the water leakage discovered in February 2014 did not result in financial detriment to the Rankins; and, therefore

    c.  the Policy did not require USAA to pay to repair or replace any logs on account of increased checking allegedly caused by the water leakage discovered in February 2014;

2.  The Rankins' Motion for Partial Summary Judgment (ECF No. 55) is DENIED; and

3.  No later than this **Thursday, August 31, 2017**, the parties are ORDERED TO SEPARATELY SHOW CAUSE why they should not be ordered to private mediation on or before **October 16, 2017** to attempt to resolve whatever disputes remain in this lawsuit.

Dated this 29th day of August, 2017.

BY THE COURT:

William J. Martinez
United States District Judge